NEW ENGLAND PETROLEUM CORPORATION *v.* JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES (13861)

SHEA, GLASS, COVELLO, HULL and SANTANIELLO, Js.

Argued January 30—decision released April 3, 1990

*Kenneth E. Werner,* for the appellant (plaintiff).

*Edward T. Blair,* assistant attorney general, with whom, on the brief, was *Clarine Nardi Riddle,* attorney general, for the appellee (defendant).

HULL, J. The sole issue in this appeal is whether certain sales of petroleum products by the plaintiff, New England Petroleum Corporation, occurred in the state of Connecticut and were therefore subject to the state tax on gross earnings from the sale of petroleum products pursuant to General Statutes § 12-587.[1] The

---

[1] General Statutes (Rev. to 1981) § 12-587 as amended by Public Acts 1982, No. 82-157, § 1, provides in part: "Any company including for purposes of this section and section 12-587a, any corporation, partnership, limited partnership, association or individual, which is engaged in the refining or distribution, or both, of petroleum products and distributes such products in this state shall pay a quarterly tax at the rate of two per cent of its gross earnings in each taxable quarter derived by such company from the sale of petroleum products in this state, provided such tax shall only be applicable to that sale of any such product which is the first sale of such product in this state. No deduction shall be made from such gross earnings for any commission, rebate or other payment, except a refund resulting from an error or overcharge. Each company shall, on or before the last

defendant, the commissioner of revenue services, assessed a gross earnings tax, plus interest, against the plaintiff on sales of fuel oil it made to Pfizer, Inc. (Pfizer), during the period October 1, 1982, through September 30, 1983. Claiming that it had not sold petroleum products in the state of Connecticut during the one year period in question, the plaintiff brought this action for return of money paid under protest as a result of the defendant's tax assessment.[2] The trial court affirmed the validity of the assessment and the plaintiff appeals. We find no error.

The underlying facts as found by the trial court are as follows. On August 1, 1980, the plaintiff entered into a written agreement with Pfizer to sell to Pfizer "#6

day of January, April, July and October of each year, render to the commissioner of revenue services, under oath of its treasurer or the person performing the duties of treasurer or of an authorized agent or officer, a return on forms prescribed or furnished by said commissioner, including in respect to such company the amount of gross earnings from the sale of petroleum products within this state for the quarter ending with the last day of the preceding month. . . ."

[2] "[General Statutes] Sec. 12-597. APPEALS BY TAXPAYER. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services made in relation to the tax imposed under section 12-587 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to said commissioner to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands and upon all such appeals which may be denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

fuel oil." Article 2 of the agreement required the plaintiff to deliver the oil to Pfizer. Pursuant to article 3 (A), the delivery was to "be made to Pfizer's shore tank at its plant in Groton, Connecticut (the 'Facility')." Article 3 (B) provided that "[t]itle and responsibility for [the] product [would] pass to Pfizer when the product [was] pumped into Pfizer's permanent flanged connection at the facility dock by [the plaintiff's] barge." A provision requiring that Pfizer provide "a sufficient depth of water at the dock at its [f]acility," so that the plaintiff's barges could come in safely was contained in article 3 (C). Article 3 (D) then provided for a form of damage payment to the plaintiff if the Pfizer facility was unable to receive the oil. Finally, in accordance with article 5 (A), the determination of the quantity of the oil delivered was to be determined "by Pfizer's storage tank measurements taken before and after each delivery" at Groton.

This purchase and sale agreement was to remain in effect for "three years beginning September 1, 1980." By letters signed by both parties, the original agreement was amended effective September 1, 1981, and again effective December 3, 1981. Neither amendment made any change in articles 3 or 5. The plaintiff argued at trial that the agreement had in fact been amended a third time. With respect to this claim, the court acknowledged that in late August, 1982, Pfizer had asked the plaintiff to prepare an "addendum to [the] fuel oil contract" that would change the location at which the title to the oil would pass. Sometime after that date the plaintiff had prepared a draft amendment to article 3. That draft was thereafter severely "marked up" in pen and pencil. On April 13, 1983, two unmarked copies of the draft were sent to a Pfizer employee authorized to purchase oil. The day of the month had not been inserted on the copies of the draft sent to Pfizer to indicate the day in August, 1982, when the

proposed agreement was to have become effective. Given this factual scenario, the court found that a third written agreement or amending letter had never been agreed to by both the plaintiff and Pfizer in regard to the sale and delivery of the oil.

The court accepted the plaintiff's claim that the place of the sale of the oil was to be determined by examining the intent of the parties and acknowleged that the intent was "best illustrated by their written agreement[s] and their conduct." The court then concluded that the parties' mutual intention, as expressed in the original written agreement and the two signed amendments thereto, was that delivery and sale of the oil would occur in Connecticut. Although the written agreement provided that it could not be modified or terminated orally, the court held that the parties nevertheless could have changed their original intention by mutual oral agreement. The court concluded, however, that, upon examination of the parties' conduct as evidenced by invoices and purchase orders concerning the oil sold to Pfizer, it could not find that the parties ever had changed their mutual agreement about the delivery and sale of the oil. In addition, the court found that the plaintiff had offered no proof that it had accounted to the states of New York, New Jersey or Pennsylvania under the gross receipts tax laws of those states for sales of portions of the oil sold to Pfizer that the plaintiff claimed had occurred in those states. Accordingly, the court rendered judgment for the defendant.

On appeal, the plaintiff does not dispute that under the original written agreement, title to the oil passed in Connecticut and the tax on the gross earnings from the sales of the petroleum applied. It claims, however, that under the circumstances here presented, the trial court erred in finding the tax applicable after August, 1982, for two reasons: (1) a third amendment to the

original agreement provided that title to the oil would pass in various other states and that a credit would be given to the plaintiff for barging costs from those out-of-state locations to Pfizer's facility at Groton; and (2) the parties acted in accordance with the amended understanding of the parties and thus implemented the new contract. The plaintiff does not mount a successful attack on the court's findings concerning either of these two claims.[3]

We first set forth the often quoted scope of our review. " 'On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D [now § 4061]. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go.' *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." *Berlin* v. *Commissioner,* 207 Conn. 289, 292–93, 540 A.2d 1051 (1988).

It is undisputed that the tax imposed is applicable to the plaintiff's sales to Pfizer only if the sales occurred

[3] The plaintiff also claims that the court erred in relying on the plaintiff's failure to pay taxes in New York, New Jersey, Pennsylvania or Louisiana to draw a negative inference against the plaintiff's claim that the parties intended title to the oil to pass in those states. In view of our disposition of this case we do not consider this additional claim.

in Connecticut. The Connecticut Uniform Commercial Code defines a "sale" as "the passing of title from the seller to the buyer for a price . . . . " General Statutes § 42a-2-106. Where title passes is appropriately determined by the intent of the parties. *New England Yacht Sales, Inc.* v. *Commissioner,* 198 Conn. 624, 633–34, 504 A.2d 506 (1986). In construing a written contract, "the intention of the parties, which must be gathered from the language of the instrument in light of the circumstances existing at the time of its execution, is controlling, [and] the ordinary meaning of language must be followed unless a technical or special meaning is clearly intended . . . . " *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 373, 321 A.2d 444 (1973).

"A written contract can be modified by a subsequent parol agreement if that is the intention of the parties"; *Grote* v. *A.C. Hine Co.,* 148 Conn. 283, 286, 170 A.2d 138 (1961); because the "parties to a written contract retain the power to alter or vary or discharge any of its provisions by a subsequent agreement." *S.H.V.C., Inc.* v. *Roy,* 188 Conn. 503, 512, 450 A.2d 351 (1982) (*Peters, J.,* dissenting). It does not "make any difference that the original written contract provided that it should not subsequently be varied except by writing. This stipulation itself may be rescinded by parol and any oral variation of the writing which may be agreed upon . . . ." 15 S. Williston, Contracts (3d Ed. 1972) § 1828.

As stated previously, the plaintiff does not challenge the trial court's conclusion that the parties' intention in the original written contract was for delivery and sale of the petroleum products to occur in Connecticut. The plaintiff relies entirely on a challenge to the court's factual conclusions concerning the parties' intent as of August, 1982. The plaintiff's argument is nothing more than a necessarily futile attempt to have us retry the facts of this case.

The plaintiff first claims that the language of the amended sales agreement expressed the intent of the parties that title to the products would pass in various locations outside the state of Connecticut. The record, however, is utterly devoid of any finding by the court that an "amended" sales agreement ever came into existence. The only reference in the memorandum of decision to such a further agreement is the court's statement that the "[p]laintiff has not proven any other written agreement" existed other than the original written agreement and the two signed amendments thereto. We have considered the plaintiff's factual claims regarding the existence of an amended sales agreement by examining the testimony relied upon by the plaintiff. Taken in the most favorable light, the testimony reveals only an unsuccessful attempt by both parties to amend the original agreement, an attempt that was fraught with misunderstandings and incomplete articulation.

The plaintiff next argues that the undisputed testimony of the officers in charge of administering the sales of the products established that the parties had agreed that the title to the oil was to pass outside of Connecticut in accordance with the terms of the amended sales agreement. We note again that the court specifically found that there was no amended sales agreement, a determination with which we do not disagree. Consequently, as with its previous claim, the plaintiff relies solely on the testimony of parties. Once again, upon careful consideration of the plaintiff's evidentiary claim, we find that while there is undoubtedly evidence that certain officers of the parties intended such a result, the court's finding that no agreement ever occurred is not clearly erroneous.

The plaintiff's strongest claim is that the uncontradicted documentary evidence of the parties' conduct subsequent to August, 1982, conclusively showed that

the parties intended that the sales of the products should take place outside of Connecticut. On this subject the court's only comment was that "[t]hese parties had interesting purchase orders and invoices, but they never changed their agreement about delivery being in Groton." The court's finding that the purchase orders and invoices were "interesting," unarticulated as it is, hardly sheds light on the court's reasoning concerning this evidence. We will, therefore, examine the documentary evidence to see if it required the trial court to find that the agreement was changed by the parties. The plaintiff flatly claims that all of the documentary evidence produced by it at trial indicated the parties' intent to have delivery and sale of the products take place outside of Connecticut. A detailed examination of these documents does not bear out this broad claim.

First, the plaintiff relies as support for its claim on a purchase order sent by Pfizer to the plaintiff that contained the statement that the F.O.B. point for the oil was "New Jersey Terminal."[4] Under Connecticut law, however, the term "F.O.B." governs delivery only "[u]nless otherwise agreed." In the present case, the trial court concluded that the parties had in fact "otherwise agreed" that the delivery was to occur in Connecticut.

---

[4] General Statutes § 42a-2-319 provides in relevant part: "(1) Unless otherwise agreed the term F.O.B., which means 'free on board,' at a named place, even though used only in connection with the stated price, is a delivery term under which (a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in section 42a-2-504 and bear the expense and risk of putting them into the possession of the carrier; or (b) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in section 42a-2-503; (c) when under either (a) or (b) the term is also F.O.B. vessel, car or other vehicle, the seller must in addition at his own expense and risk load the goods on board. If the term is F.O.B. vessel the buyer must name the vessel and in an appropriate case the seller must comply with the provisions of section 42a-2-323 on the form of bill of lading."

The plaintiff also argues that invoices dated after August, 1982, evidence the parties' intent that the title to the oil pass outside the state of Connecticut. While these invoices indicate a delivery point located outside of Connecticut, three of the invoices do not provide any credit to Pfizer for the insurance or freight, which was supposed to be a component of the modified agreement. At oral argument, the plaintiff claimed that one of its officers testified at trial that two of the three invoices in evidence did not show a credit for insurance or a freight allowance but showed, instead, two different prices for the oil delivered. Since the provision of credit to Pfizer for insurance or freight was supposed to be a component of the modified agreement, however, it is that credit with which we are concerned. On the record before us, three of the invoices in evidence dated after the claimed amended agreement was reached showed such credits and three did not.

It is thus readily apparent that rather than showing a lack of factual underpinning for the court's conclusion that the original agreement was not amended, the documentary evidence cited by the plaintiff is equivocal at best. The parties may have tried to amend the written agreement by drafting a third amendment to it. It is clear, however, that through a series of management errors and oversights there never occurred a final agreement upon the contents of such a third amendment nor was there ever any such oral agreement fully implemented by the parties.

We conclude, therefore, that the factual underpinnings of the court's decision, on this record, are sound and the judgment of the court is not clearly erroneous.

There is no error.

In this opinion the other justices concurred.