UNITED TECHNOLOGIES CORPORATION *v.* JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES (14248)

SHEA, CALLAHAN, COVELLO, BORDEN and BERDON, Js.

Argued October 3—decision released December 24, 1991

Charles H. Lenore, with whom were *James Sicilian* and, on the brief, *Thomas R. Webb,* for the appellant (plaintiff).

*Jonathon L. Ensign,* assistant attorney general, with whom were *Richard K. Greenberg,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellee (defendant).

CALLAHAN, J. During the years 1976 through 1982, the plaintiff, United Technologies Corporation (UTC), was a corporation organized and existing under the laws of the state of Delaware. During those years, UTC did business in Connecticut and, consequently, was subject to the Connecticut corporation business tax embodied in chapter 208 of the General Statutes, Revision of 1958, as amended (corporation business tax).[1] The

---

[1] "The Connecticut corporation business tax; General Statutes § 12-213 et seq.; is a tax upon the franchise of corporations, whether they be domestic or foreign, 'for the privilege of carrying on or doing business, owning or leasing property within the state in a corporate capacity . . . .' General Statutes § 12-214; *Connecticut Bank & Trust Co.* v. *Tax Commissioner,* 178 Conn. 243, 247, 423 A.2d 883 (1979); *Spector Motor Service, Inc.* v. *Walsh,* 135 Conn. 37, 56, 61 A.2d 89 (1948); *Stanley Works* v. *Hackett,* 122 Conn. 547, 551, 190 A. 743 (1937); *Underwood Typewriter Co.* v. *Chamberlain,* 94 Conn. 47, 55, 108 A. 154 (1919), aff'd, 254 U.S. 113, 41 S. Ct. 45, 65 L. Ed. 165 (1920)." *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 415, 521 A.2d 569 (1987).

defendant was the commissioner of the department of revenue services for the state of Connecticut (commissioner) at the time of the institution of this action and the action was brought against him in his official capacity. For the income years 1976 through and including 1982, UTC was a corporation taxable both within and without Connecticut and therefore subject to the apportionment provisions of General Statutes § 12-218.[2]

For the years 1976 through 1982, UTC timely filed its Connecticut corporation business tax returns and timely paid in full all taxes and charges that its calculations indicated were due. Thereafter, the commissioner conducted an audit of UTC's corporation business tax returns for the years 1976 through 1982. As a result, on August 2, 1986, the commissioner notified UTC that he had assessed additional corporation business taxes and interest. The disputed portion of the commissioner's increased assessment was based on his determination that UTC was not allowed to utilize, and should not have utilized operating loss carryovers from 1979 and 1980 in computing its net income for the year 1981. The additional assessment attributable to the commissioner's disallowance of UTC's use of its operating loss carryovers in computing its 1981 corporation business tax increased UTC's corporation business tax liability for that year from $231,316, which UTC had previously acknowledged and paid, to $4,254,897 plus interest.

---

[2] "[General Statutes (Rev. to 1983)] Sec. 12-218. APPORTIONMENT OF NET INCOME. Any taxpayer which is taxable both within and without this state shall apportion its net income as provided in this section. For purposes of apportionment of income under this section, a taxpayer is taxable in another state if in such state such taxpayer conducts business and is subject to a net income tax, a franchise tax for the privilege of doing business, or a corporate stock tax, or if such state has jurisdiction to subject such taxpayer to such a tax, regardless of whether such state does, in fact, impose such a tax. . . ."

Subsequently, UTC paid to the commissioner the amount shown as the total due on the commissioner's notice of additional assessment dated August 2, 1986. At the same time, UTC filed a request pursuant to General Statutes § 12-236[3] for a hearing and a correction of the amount of the additional taxes and interest assessed by the commissioner. The commissioner denied UTC's request for a hearing. Thereafter, UTC filed this appeal pursuant to General Statutes § 12-237.[4]

[3] "[General Statutes (Rev. to 1987)] Sec. 12-236. HEARING BY COMMISSIONER. Any taxpayer, aggrieved by the action of the commissioner or his authorized agent in fixing the amount of any tax, penalty or interest provided for by this part, may apply to the commissioner, in writing, within thirty days after the notice of such action is delivered or mailed to it, for a hearing and a correction of the amount of the tax, penalty or interest so fixed, setting forth the reasons why such hearing should be granted and the amount in which such tax, penalty or interest should be reduced. The commissioner shall promptly consider each such application and may grant or deny the hearing requested. If the hearing is denied, the applicant shall be notified thereof forthwith. If it is granted, the commissioner shall notify the applicant of the time and place fixed for such hearing. After such hearing the commissioner may make such order in the premises as appears to him just and lawful and shall furnish a copy of such order to the applicant. The commissioner may, by notice in writing, at any time within three years after the date when any return of any taxpayer has been due, order a hearing on his own initiative and require the taxpayer or any other individual whom he believes to be in possession of relevant information concerning the taxpayer to appear before him or his authorized agent with any specified books of account, papers or other documents, for examination under oath."

[4] "[General Statutes (Rev. to 1987)] Sec. 12-237. APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under the provisions of this part may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. Such citation shall be signed by the same authority, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a com-

At the request of the parties, the single issue of law in controversy between them was later reserved by the trial court for the advice of the Appellate Court. We transferred the appeal to ourselves pursuant to Practice Book § 4023.

The single issue reserved for the advice of the court is: "For the purposes of the Connecticut corporate business tax, is a taxpayer entitled to utilize its operating loss carryovers from 1979 and 1980 in computing its net income or loss under Connecticut General Statutes § 12-219 (1) (B) (i) for 1981 and 1982?"[5] No evidence was taken in the trial court and the parties have filed a stipulation containing the facts necessary for a resolution of the reserved question.

In order to answer the reserved question it is necessary to review briefly the relevant history of the corporation business tax. The parties stipulated that prior to the income year 1981, taxpayers subject to the corporation business tax were required to compute their business tax liability using whichever of three methods yielded the highest tax: (a) the "regular tax" imposed by General Statutes § 12-214,[6] which was generally

---

mittee appointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of six per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which may be denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[5] The parties have briefed only the question whether UTC was entitled to use its operating loss carryovers from 1979 and 1980 in computing its net income or loss under General Statutes § 12-219 (1) (B) (i) for the year 1981. We will therefore specifically address only that year. Our conclusions, however, as to the application of operating loss carryovers vis-a-vis § 12-219 (1) (B) (i) would also apply to the year 1982.

[6] "[General Statutes (Rev. to 1981)] Sec. 12-214. IMPOSITION OF TAX. Every mutual savings bank, savings and loan association and every company engaged in the business of carrying passengers for hire over the highways of this state in common carrier motor vehicles doing business in this state,

equal to 10 percent of the net income of the taxpayer;
(b) the "alternative tax" imposed by General Statutes

and every other company carrying on, or having the right to carry on, business in this state, including a dissolved corporation which continues to conduct business, except (1) as to income years beginning prior to January 1, 1973, insurance companies, and as to income years beginning on or after January 1, 1973, insurance companies incorporated or organized under the laws of any other state or foreign government, (2) companies exempt by the federal corporation net income tax law, and any company which qualifies as a Domestic International Sales Corporation (DISC) as defined in Section 992 of the Internal Revenue Code of 1954, as amended, and as to which a valid election under Subsection (b) of said Section 992 to be treated as a DISC is effective, but excluding companies, other than any company which so qualifies as, and so elects to be treated as, a DISC, which elect not to be subject to such tax under any provision of said Internal Revenue Code other than said Subsection (b) of said Section 992, (3) companies subject to gross earnings taxes under chapter 210, (4) companies all of whose properties in this state are operated by companies subject to such gross earnings taxes but not subject to the tax imposed by this part, (5) nonprofit cooperative ownership housing stock and nonstock corporations, when residence in such housing is restricted to members of the corporation and ownership in such corporation is restricted to occupants of such housing, (6) cooperative housing corporations, as defined for federal income tax purposes, where there is no taxable income to the corporation; (7) any organization or association of two or more persons established and operated for the exclusive purpose of promoting the success or defeat of any candidate for public office or of any political party or question or constitutional amendment to be voted upon at any state or national election or for any other political purpose and (8) individually owned companies whose gross annual revenues in the most recently completed year did not exceed one hundred million dollars and who engaged in the research, design, manufacture, sale or installation of alternative energy systems, including their parts and components, where such companies net income is directly attributable to such purposes, shall pay, annually, a tax or excise upon its franchise for the privilege of carrying on or doing business, owning or leasing property within the state in a corporate capacity or as an unincorporated association taxable as a corporation for federal income tax purposes or maintaining an office within the state, such tax to be measured by the entire net income as herein defined received by such corporation or association from business transacted within the state during the income year and to be assessed for each income year which begins on and after January 1, 1975, at the rate of ten per cent; provided, for income years beginning prior to January 1, 1974, the rate applicable to insurance companies subject to tax under this section shall be two per cent. The exemption of companies included in subdivision (8) of this section shall not be allowed after July 1, 1985."

§ 12-219 (1) (A),[7] which was generally equal to 3/10 mills per dollar of average net book value of the taxpayer, up to a maximum tax of $100,000, plus under

[7] "[General Statutes (Rev. to 1981)] Sec. 12-219. ADDITIONAL TAX. (1) For each income year beginning on or after January 1, 1973, for which the tax calculated under subdivision (A) of this section exceeds the tax imposed by section 12-214, each company subject to the provisions of this part, except savings banks, Morris plan companies, corporations qualified under the laws of the United States as small business investment companies and state banks and trust companies incorporated under the laws of this state and production credit associations and savings and loan associations and banks incorporated under the laws of the federal government and The Connecticut Development Credit Corporation, shall pay for the privilege of carrying on or doing business within the state, in addition to the tax imposed by section 12-214, an additional tax of the amount by which the tax calculated under subdivision (A) of this section for such income year exceeds the tax imposed by section 12-214. In the case of a company other than a regulated investment company or real estate investment trust, the tax calculated under this section shall be: (A) A tax of thirty-one one hundredths of a mill per dollar for each income year of the amount derived (a) by adding (i) the average value of the issued and outstanding capital stock, including treasury stock at par or face value, fractional shares, script certificates convertible into shares of stock and amounts received on subscriptions to capital stock, computed on the balances at the beginning and end of the taxable year or period, the average value of surplus and undivided profit computed on the balances at the beginning and end of the taxable year or period, and (ii) the average value of all surplus reserves computed on the balances at the beginning and end of the taxable year or period, (b) by subtracting from the sum so calculated (i) the average value of any deficit carried on the balance sheet computed on the balances at the beginning and end of the taxable year or period, and (ii) the average value of any holdings of stock of private corporations including treasury stock shown on the balance sheet computed on the balances at the beginning and end of the taxable year or period, and (c) by apportioning the remainder so derived between this and other states under the provisions of section 12-219a, provided in no event shall the tax so calculated exceed one hundred thousand dollars or be less than fifty dollars. For each income year beginning on or after January 1, 1972, in the case of any regulated investment company or real estate investment trust, which, in arriving at net income as defined in section 12-213, is entitled to a deduction under section 12-217 for dividends paid as defined in the federal corporation income tax law, the tax calculated under this subdivision shall not exceed ten thousand dollars and shall be calculated at the rate of five-tenths of one mill per dollar of the amount derived by adding the average value of the issued and outstanding

§ 12-219 (1) (A) and General Statutes § 12-223c, the sum of $250 for each company, other than the taxpayer, included in the taxpayer's combined return; or (c) the "minimum tax" of $250 per corporation included in a

capital stock including treasury stock at par or face value, fractional shares, script certificates convertible into shares of stock and amounts received on subscriptions to capital stock, computed on the balances at the beginning and end of the taxable year or period, and the average value of surplus and undivided profits computed on the balances at the beginning and end of the taxable year or period, provided, where the remainder so derived as aforesaid is apportioned between this state and other states under the provisions of section 12-219a, the tax calculated under this subdivision for any such company shall not exceed the lesser of ten thousand dollars and the tax calculated under this sentence, multiplied, in either case, by a fraction the numerator of which is the additional tax base apportioned to this state under section 12-219a and the denominator of which is the entire additional tax base. The tax shall, in no case, be less than fifty dollars for any income year. For purposes of this subdivision, in the case of a new domestic company, the balances at the beginning of its first fiscal year or period shall be the balances immediately after its organization or immediately after it commences business operations, whichever is earlier; and in the case of a foreign company, the balances at the beginning of its first fiscal year or period in which it becomes liable for the filing of a return in this state shall be the balances as established at the beginning of the fiscal year or period for tax purposes. In the case of a domestic company dissolving or limiting its existence, the balances at the end of the fiscal year or period shall be the balances immediately prior to the final distribution of all its assets; and in the case of a foreign company filing a certificate of withdrawal, the balances at the end of the fiscal year or period shall be the balances immediately prior to the withdrawal of all of its assets. When a taxpayer has carried on or had the right to carry on business within the state for eleven months or less of the income year, the tax calculated under subdivision (A) of this section shall be reduced in proportion to the fractional part of the year during which business was carried on by such taxpayer. The tax calculated under subdivision (A) of this section shall, in no case, be less than fifty dollars for each income year. The taxpayer shall report the items set forth in subdivision (A) of this section at the amounts at which such items appear on its books; provided, when, in the opinion of the commissioner of revenue services, the books of the taxpayer do not disclose a reasonable valuation of such items, the commissioner may require any additional information which may be necessary for a reasonable determination of the tax calculated under subdivision (A) of this section and shall, on the basis of the best information available, calculate such tax and notify the taxpayer thereof."

combined return pursuant to §§ 12-219 (1) (A)[8] and 12-223c.[9]

In January, 1981, however, the legislature amended § 12-219 to provide that in addition to the three bases of computation noted above, corporations would also be required to compute their corporation business tax liability under a fourth measure of the tax popularly known as the "fourth base." Under the "fourth base," corporations were required to pay a tax at a rate of 5 percent measured by 50 percent of the net income or loss of the corporation received from business transacted within Connecticut, plus 50 percent of the salaries and other compensation, apportioned to Connecticut, paid to officers of the corporation and certain shareholders. General Statutes § 12-219 (1) (B).[10]

---

[8] It appears that the figures stipulated to are not entirely accurate. Prior to the January, 1981 legislative session, the amount paid for each corporation included in a joint return was $50. The revision of General Statutes § 12-219 enacted in that term raised that amount to $250. See General Statutes (Rev. to 1983) § 12-219. For purposes of this opinion, however, the inaccuracy is inconsequential.

[9] "[General Statutes (Rev. to 1981)] Sec. 12-223c. MINIMUM TAX IN COMBINED RETURN. Each corporation included in a combined return, other than the corporation whose tax is computed and paid on the combined basis, shall pay the minimum tax of fifty dollars prescribed under section 12-219."

[10] General Statutes (Rev. to 1983) § 12-219 (1) (B) provides: "ADDITIONAL TAX IN THE AMOUNT BY WHICH ALTERNATIVE COMPUTATIONS EXCEED TAX UNDER SECTION 12-214. MINIMUM TAX.

*[Text of section applicable to income years of corporations before January 1, 1983]*

"(1) For each income year beginning on or after January 1, 1973, for which the tax calculated under subdivision (A) of this section, or subdivision (B) of this section with respect to any company the gross income of which exceeds fifty thousand dollars in such income year, whichever is higher, exceeds the tax imposed by section 12-214, each company subject to the provisions of this part, except savings banks, Morris plan companies, corporations qualified under the laws of the United States as small business investment companies and state banks and trust companies incorporated under the laws of this state and production credit associations and savings and loan associations and banks incorporated under the laws of the federal government and The Connecticut Development Credit Corporation, shall pay for the privilege of carrying on or doing business within

"The new additional tax base embodied in § 12-219 (1) (B) was enacted as a parallel provision to the Unincorporated Business Tax, General Statutes § 12-610 et seq. See 24 S. Proc., Pt. 10, 1981 Sess., p. 3308; 24 H.R. Proc., Pt. 15, 1981 Sess., p. 5077. The

the state, in addition to the tax imposed by section 12-214, an additional tax of the amount by which the tax calculated under subdivision (A) or subdivision (B) of this section, whichever is higher, for such income year exceeds the tax imposed by section 12-214. In the case of a company other than a regulated investment company or real estate investment trust, the tax calculated under this section shall be . . . (B) A tax to be measured by fifty per cent of (i) the net income or loss of such corporation or association but only to the extent that said income or loss is allocated and apportioned to this state, which income is the entire net income as defined in this chapter received by such corporation or association from business transacted within the state during the income year and which loss is the net loss of such corporation or association related to business transacted within the state during the income year, plus (ii) salaries and other compensation paid to the elected or appointed officers of such corporation or association, and to every shareholder owning in excess of one percent of the issued capital stock of such corporation or association, apportioned to this state by means of the apportionment fraction determined under subdivision (3) of section 12-218, at the rate of five per cent. The provisions of section 12-219a shall not apply to this subdivision. For purposes of this subdivision, the term 'elected or appointed officer' shall include the chairman, president, vice president, secretary, assistant secretary, treasurer, assistant treasurer, comptroller and any other person, irrespective of his title, who is charged with and performs any of the regular functions of any such officer. A director shall be considered an elected or appointed officer only if he performs duties ordinarily performed by an officer. When a taxpayer has carried on or had the right to carry on business within the state for eleven months or less of the income year, the tax calculated under subdivision (A) of this section shall be reduced in proportion to the fractional part of the year during which business was carried on by such taxpayer. The tax calculated under subdivision (A) or subdivision (B) of this section shall, in no case, be less than two hundred fifty dollars for each income year. The taxpayer shall report the items set forth in subdivision (A) of this section at the amounts at which such items appear upon its books; provided, when, in the opinion of the commissioner of revenue services, the books of the taxpayer do not disclose a reasonable valuation of such items, the commissioner may require any additional information which may be necessary for a reasonable determination of the tax calculated under subdivision (A) of this section and shall, on the basis of the best information available, calculate such tax and notify the taxpayer thereof."

unincorporated business tax, which has since been repealed; see Public Acts, Spec. Sess., November, 1981, No. 81-4, §§ 31, 32 (7); imposed a 5 percent tax on the taxable net income of unincorporated Connecticut businesses whose gross income exceeded $50,000. General Statutes § 12-611. While certain deductions from gross income were allowed in computing taxable net income; see General Statutes §§ 12-612, 12-615; a business could *not* deduct amounts paid to a proprietor or partner for services rendered. See General Statutes § 12-612 (1).

"While the legislature was considering passage of the unincorporated business tax, one of its main concerns was whether unincorporated businesses would incorporate in order to avoid the new tax. See 24 S. Proc., Pt. 7, 1981 Sess., p. 2118. In other words, an unincorporated business, faced with the prospect of paying the new tax, might well decide to incorporate and then to 'drain away' its taxable income by paying it to officers and shareholders in the form of salaries, bonuses and other benefits, those amounts being deductible in computing the net income of a *corporation*. See General Statutes § 12-217. The new additional tax base of § 12-219 (1) (B) was added to the corporate tax structure to prevent this method of circumventing the unincorporated business tax. 24 S. Proc., Pt. 10, 1981 Sess., p. 3308. Under § 12-219 (1) (B) (ii), 'salaries and other compensation' paid to officers and 1 percent shareholders, which were deducted in computing the net income of a corporation, were to be added back to net income in calculating the corporation's tax base." (Emphasis in original.) *George P. Gustin Associates, Inc.* v. *Dubno,* 203 Conn. 198, 205–206, 524 A.2d 603 (1987).

For the income years 1979 and 1980, UTC had operating losses apportioned to Connecticut in the amounts of $102,414,410 and $76,596,988, respectively. In computing its tax liability for the year 1981, UTC carried over those operating losses so as to reduce its net

income to zero for use in computing the amount of corporation business tax that it owed for 1981 for purposes of both the "regular tax" imposed by § 12-214 and the "fourth base" tax imposed by § 12-219 (1) (B).[11] Because the "regular tax" was determined simply by multiplying net income by 10 percent under that method of calculation, UTC owed no business tax for 1981. Under the "fourth base" tax of § 12-219 (1) (B), however, although its operating loss carryovers reduced UTC's net income to zero, it was required to add back salaries and other compensation paid to officers in the amount of $8,532,635. Fifty percent of that amount at a tax rate of 5 percent yielded a tax of $213,316. That being the highest tax payable under the four bases for determining liability, UTC paid that amount of corporation business taxes for the year 1981.

The commissioner, however, contends that while UTC correctly deducted its operating loss carryovers in calculating net income and its consequent corporation business tax liability for 1981 under the "regular tax" of § 12-214, it was not allowed to use, and incorrectly used, its operating loss carryovers in determining its net income and consequent corporation business tax liability under the "fourth base" of § 12-219 (1) (B) (i). We disagree.

"Net income" under § 12-219 (1) (B) (i) was stated to be: "net income as defined in this chapter." The sole definition of "net income" in chapter 208, concerning the imposition and payment of the corporation business tax, was contained in § 12-213,[12] which defined "net

---

[11] Because the other methods of determining corporation business tax liability did not entail a tax on net income, these two methods are the only ones in issue. Under General Statutes § 12-219 (1) (A), UTC's corporation business tax liability would have been $100,000, plus $250 for each affiliated company included in its combined return. Under General Statutes §§ 12-219 (1) (A) and 12-223c its corporation business tax liability would have been $5750.

[12] "[General Statutes (Rev. to 1983)] Sec. 12-213. DEFINITIONS. When used in this part, unless the context otherwise requires . . . 'net income' means net earnings received during the income year and available for con-

income," in relevant part, as "net earnings received during the income year . . . computed by subtracting from gross income the deductions allowed by the terms of section 12-217 . . . ." In turn, § 12-217 provided in relevant part that "[n]otwithstanding anything in this section to the contrary, (1) any excess of the deductions provided in this section for any income year commencing on or after January 1, 1973, over the gross income for such year or the amount of such excess apportioned to this state under the provisions of section 12-218, shall be an operating loss of such income year and *shall be deductible as an operating loss carryover in each of the five income years following such loss year,* provided the portion of such operating loss which may be deducted as an operating loss carryover in any income year following such loss year shall be limited to . . . (i) any net income greater than zero of such income year following such loss year, or in the case of a company entitled to apportion its net income under the provisions of section 12-218, the amount of such net income which is apportioned to this state thereto . . . ." (Emphasis added.)

As previously noted, the commissioner has stipulated that UTC sustained the operating losses, apportionable to Connecticut, previously indicated for the years 1979 and 1980. It would appear then, that under a plain reading of the pertinent statutes, UTC was entitled to carry over those operating losses to reduce its net income to a number not less than zero, for purposes of § 12-219 (1) (B) (i), until the carryovers were exhausted, for each of the five income years following the loss years. See *Murphy* v. *State Employees Retirement Commission,* 218 Conn. 729, 735, 590 A.2d 974 (1991). The commissioner has failed to provide us with

---

tributors of capital, whether they are creditors or stockholders, computed by subtracting from gross income the deductions allowed by the terms of section 12-217 . . . ."

a compelling reason why that is not so or why the meaning conveyed by the plain reading of the statutes is not the proper one. See *Tiernan* v. *Trustees of California State University & Colleges,* 33 Cal. 3d 211, 218–19, 655 P.2d 317, 188 Cal. Rptr. 115 (1982); 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) § 46.01, p. 74.[13]

The commissioner, moreover, has conceded that UTC properly used its operating loss carryovers to reduce its net income to zero in 1981, under the "regular tax" of § 12-214, with the result that there was no corporation business tax due the commissioner from UTC under that section. He insists, however, that the same operating loss carryovers could not and should not have been used by UTC to reduce its net income under § 12-219 (1) (B) (i). The commissioner's positions are inconsistent.

Both §§ 12-214 and 12-219 (1) (B) (i) provide that "net income" is the "entire net income [as defined in chapter 208] received by such corporation or association from business transacted within the state during the income year . . . ." As previously indicated, "net income" is defined in § 12-213 as "net earnings received during the income year . . . computed by subtracting from gross income the deductions allowed by the terms of section 12-217," and § 12-217 allows the deduction of operating loss carryovers. If we were to conclude that corporate taxpayers were allowed to use operating loss carryovers to arrive at "net income" under § 12-214 but not allowed to use operating loss carryovers to determine "net income" under

---

[13] In a case addressing the exact issue found in this case, the Superior Court (*Aspell, J.*) concluded that a plain reading of the applicable statutes allowed the use of operating loss carryovers as a deduction under General Statutes § 12-219 (1) (B). *Distributor Publications* v. *Commissioner of Revenue Services,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 299080 (October 14, 1987).

§ 12-219 (1) (B) (i), we would be attributing two different meanings to the same term, "net income," in the same statutory scheme. Such a result is contrary to both common sense and the rules of statutory construction. *Board of Education* v. *State Board of Labor Relations,* 217 Conn. 110, 116, 584 A.2d 1172 (1991); *Plasticrete Block & Supply Corporation* v. *Commissioner,* 216 Conn. 17, 27, 579 A.2d 20 (1990); *Stamford Ridgeway Associates* v. *Board of Representatives,* 214 Conn. 407, 432, 572 A.2d 951 (1990); 73 Am. Jur. 2d, Statutes § 232. Furthermore, we have found nothing in our search of the legislative history of § 12-219 (1) (B), nor has the commissioner called our attention to anything in that history, that would lead us to believe that the legislature intended that operating loss carryovers, while deductible to arrive at net income under § 12-214, were not deductible for that purpose under § 12-219 (1) (B) (i). In summary, there is no indication from any persuasive source that would induce us to conclude that the meanings or interpretations of the term "net income" in §§ 12-214 and 12-219 (1) (B) (i) were to be dissimilar or that "net income" consisted of different components depending on which of the two statutes was applied.

An interpretation of § 12-219 (1) (B) (i) that allowed for the use of operating loss carryovers in arriving at net income would also be compatible with the genesis of that section. As we stated in *George P. Gustin Associates, Inc.* v. *Dubno,* supra, 205–206, § 12-219 (1) (B) was passed in 1981 in order to foreclose attempts by unincorporated businesses to circumvent the newly enacted unincorporated business tax by incorporating and paying out all their earnings to principals in salaries and other compensation and thus avoiding payment of business taxes altogether.[14] Obviously, the elimination of

---

[14] The unincorporated business tax was repealed for income years commencing on or after January 1, 1983. Public Acts, Spec. Sess., November,

operating loss carryovers was not necessary to accomplish the purpose for which the statute was enacted. Taxing the salaries and other compensation paid corporate officers would have achieved the intended purpose. See *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn 529, 536, 494 A.2d 555 (1985).

Also if the legislature had intended such a radical departure from the established method of calculating net income, a method that the commissioner concedes is allowed under § 12-214, a statute enacted many years prior to § 12-219 (1) (B), it surely would have manifested clearly its intention to do so. "In the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 667, 103 A.2d 535 (1954); *Kinney* v. *State*, 213 Conn. 54, 66, 566 A.2d 670 (1989); *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 481, 542 A.2d 692 (1988); *Gomeau* v. *Forrest*, 176 Conn. 523, 527, 409 A.2d 1006 (1979). The commissioner would have us conclude, however, that it was the legislative intent, in order to enforce the new unincorporated business tax, to enact a tax statute that had the potential to raise a taxpayer's corporation business tax liability astronomically, in this instance from zero under § 12-214 and a maximum of $100,000 under § 12-219 (1) (A), to well over $4,000,000 under § 12-219 (1) (B), without any indication in the newly enacted legislation that it was doing so. The commissioner would have us determine, moreover, that this was done without any discussion or mention of that potential tax increase in either house of the legislature during the debate on the bill embodying the statute.

1981, No. 4, §§ 31, 32 (7). Because the repeal of the unincorporated business tax eliminated the need for the "fourth base" of General Statutes § 12-219 (1) (B), it was also repealed at the same time. See id., § 30. Section 12-219 (1) (B) was in existence, therefore, only for the years 1981 and 1982.

Furthermore, as UTC points out in its brief, the purpose of allowing operating loss carryovers is to mitigate the rigidity of the annual accounting period; J. Mertens, Law of Federal Income Taxation (1987) § 29.01, p. 3; and "enable a taxpayer to average income and losses over a period of years to reduce the disparity between the taxation of businesses that have stable income and businesses that experience fluctuations in income." Williamson, 9-4th T.M., Net Operating Losses—Concepts and Computations, A-1 (1988). "An inequitable tax burden would result if companies were taxed during profitable periods without receiving any relief during periods of net operating losses." D. Kieso & J. Weygandt, Intermediate Accounting (6th Ed. 1989) p. 939. We fail to understand why, if viable under the "regular tax" of § 12-214, the policy of averaging out income and losses is inapplicable to the "fourth base" tax of § 12-219 (1) (B) (i). The policy supporting the use of operating loss carryovers to reduce income is no less compelling under § 12-219 (1) (B) (i) than it is under § 12-214 and we see no justification for disparity in their treatment under the two statutes. We continue to believe, as we stated in *George P. Gustin Associates, Inc.* v. *Dubno,* supra, 200, that the first step in ascertaining the corporation business tax under § 12-219 (1) (B) was "to compute the Connecticut net income *in the same manner* as under the net income base of § 12-214." (Emphasis added.)[15]

---

[15] The commissioner also contends that UTC's interpretation of General Statutes § 12-219 (1) (B) is incorrect because hypothetically it could result in the double utilization of a deduction. He argues that theoretically a loss could lower the salary component of § 12-219 (1) (B) in the loss year and also be carried over as an operating loss in ensuing years. While that may have been possible, a similar result was also theoretically possible under the unincorporated business tax. Because § 12-219 (1) (B) and the unincorporated business tax were intended to be "parallel taxes," that argument of the commissioner is unavailing. See *George P. Gustin Associates, Inc.* v. *Dubno,* 203 Conn. 198, 206, 524 A.2d 603 (1987). Moreover, in this instance, such a double deduction did not occur and could not have occurred because the operating losses carried over by UTC were incurred in years prior to the effective date of § 12-219 (1) (B) and the utilization of the salary component.

We conclude that by the enactment of § 12-219 (1) (B) the legislature did not intend to prohibit the use of operating loss carryovers to compute net income and consequent corporation business tax liability under that section.

The answer to the reserved question is yes.

No costs shall be taxed to either party.

In this opinion the other justices concurred.